## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-00261-001(CRC)** |
| **v.** | : | |
| | : | |
| **TRUDY CASTLE,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Trudy Castle to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Defendant Trudy Castle, a 57-year-old property manager, along with her codefendant and sister, Kimberly DiFrancesco (who is scheduled to be sentenced simultaneously), participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on August 17, 2022, (ECF No. 28 at ¶ 6) reflects a sum of more than $2.7 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Castle pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution is appropriate in this case because: (1) Defendant likely saw violence outside before entering the Capitol building, and observed police presence both around and inside of the Capitol building; (2) she entered the Capitol through the Senate Wing Door only minutes after the first rioters breached the Capitol building through a broken window next to that same door; (3) she stayed inside the Capitol building for almost 40 minutes, entering various locations throughout the building both downstairs and upstairs; (4) while parading through the halls of the Capitol she took photos and left only after officers began using tear gas to clear rioters from the building; (5) even after she exited the Capitol she stood outside of the Capitol building and remained on restricted grounds for over an hour; and (6) she removed evidence from her phone after the event.

Prior to entering the U.S. Capitol on January 6, Castle and DiFrancesco drove from Chicago, Illinois to Washington, D.C., to protest Congress' certification of the Electoral College. On January 6, Castle and DiFrancesco advanced on the Capitol, entering through the Senate Wing Door minutes after an adjacent window was first breached by a rioter smashing through it with a stolen riot shield. They walked past the shattered window and penetrated the U.S. Capitol building. Undeterred by that behavior, they continued deeper into the U.S. Capitol walking upstairs and downstairs to the Visitor Center, the first-floor lobby, and the Crypt, until they were tear gassed and exited the building. After exiting, they waited outside of the Capitol on restricted grounds and are seen walking up to the Capitol again as if they were going to enter a second time.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on

numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed. Here, the defendant's participation in a riot that succeeded in halting the Congressional certification, combined with the facts that: the defendant entered the Capitol building after observing police presence outside of the building; she stayed almost 40 minutes in the Capitol building entering various locations and taking photographs while alarms were ringing; and she left the building only after getting tear gassed, renders a jail sentence and a lengthy period of probation both necessary and appropriate in this case.

## II.   Factual and Procedural Background

*The January 6, 2021, Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 28 (Statement of Offense), at 1-7.

*Defendant Castle's Role in the January 6, 2021, Attack on the Capitol*

On January 5, 2021, Trudy Castle and Kimberly DiFrancesco drove to Washington, D.C., from their homes in Illinois to attend the "Stop the Steal" rally. Castle's adult son also drove with them. The purpose of their trip was to protest Congress' certification of the Electoral College. *See* ECF 28 at ¶ 8. On January 6, 2021, Castle and her family members walked with other protestors from the rally to the U.S. Capitol. They approached the building from the west side, and, at approximately 2:19 p.m., made their way to the Upper West Terrace, part of the restricted area of the Capitol. At around 2:24 p.m., Castle entered the Capitol building though the Senate Wing Door, which had first been breached by rioters breaking the window adjacent to the door, just minutes before she entered. [2] Additionally, there were people entering through the adjacent window as she

---

[2] Attached please find a video labeled "Exh 1 – ProPublica," which depicts what occurred minutes before defendants entered the Senate Wing door and the sounds coming from the Senate Wing Door once breached by rioters.

entered, and the sound of the building's alarms rang through the building as both Defendants paraded through the Capitol.[3]



Castle is seen, in the above and below U.S. Capitol Police CCTV footage, wearing a white jacket, dark pants, and a red, white, and blue knit "Trump" hat (in yellow box, above). DiFrancesco is seen wearing a black jacket with a red hood and black hat (in red box, above). When Castle and DiFrancesco entered, they did not submit to any security screening, but proceeded to walk through the Capitol, to the North side and into the Visitor's Center.

---

[3] Attached please find a video labeled, "Exh 2 – Senate Wing Door," depicting both defendants walking into the Capitol through the Senate Wing Door.



As Castle and her sister DiFrancesco paraded through the halls, defendant waved two small American flags and her sister DiFrancesco carried a handheld radio to communicate with others. Castle took photos while inside of the Capitol depicting police officers and other rioters. A small number of photos and videos were recovered from Castle's phone, including the one shown below:



Soon after this live picture was taken above, Castle and DiFrancesco experienced police tear gassing rioters. Only then did Castle and DiFrancesco decide to exit the building. Castle and

DiFrancesco exited the Capitol at approximately 3:02 p.m., nearly 40 minutes after they initially entered. After exiting the Capitol, Castle and DiFrancesco set up chairs on the Northwest Courtyard Lawn and sat until 3:49 p.m (as shown below). Around approximately 3:49 p.m., Castle, DiFrancesco, and Castle's son approached the Senate Wing Door again, but they did not enter. At 4:21 p.m., Castle and her family walked away from the Senate Wing Door area. Castle and DiFrancesco remained on the restricted grounds outside of the Capitol for more than one hour after exiting the Capitol.



According to Castle, who spoke to the Federal Bureau of Investigation (FBI) as a requirement of her plea agreement (described further below), Castle admitted that they walked through the scaffolding by the Upper West Terrace and entered the Capitol through the Senate Wing Door. As they were approaching the Capitol and they saw police officers. Castle took a picture of police, as seen below.



DiFrancesco also saw a rioter with blood coming from his head and took a picture of it, as shown below. Castle and DiFrancesco were together while they were outside the Capitol building.



Castle also admitted that they were tear gassed and decided to leave the building. Both Castle and DiFrancesco have admitted that they knew at the time they entered the U.S. Capitol Building that they did not have permission to do so, and they willfully and knowingly paraded, demonstrated, and picketed inside the U.S. Capitol Building.

*Search of Castle's Home and Cell Phone*

On June 1, 2022, at approximately 6:00 a.m. CST, FBI agents executed two search warrants at the Defendant's home. The FBI seized a cell phone that was on Castle's person, a black handheld radio, a red Trump hat (provided by Castle), and a white jacket (provided by Castle). Upon review of the cell phone, the FBI found limited evidence of Castle's participation in the events of January 6. They later found out, through an interview with Castle, that she deleted all photos and evidence from her phone related to January 6 upon leaving the DC area. According to defendant, they wanted to forget this event happened. FBI was able to retrieve 3 videos and 9 live photos from Castle's phone that were taken in or around the Capitol on January 6, 2021.

*Castle's Post-Plea Interview with the FBI*

On October 14, 2022, Castle gave an interview as part of her plea agreement to the FBI. During her interview, Castle indicated that on January 5, 2021, she went to Washington, D.C. with her sister DiFrancesco and her son. On January 6, 2021, they went to President Trump's speech. After the speech, Castle indicated that they walked to the Capitol. Defendant affirmed that the pathway leading to the doors Castle entered the building through was blocked by the scaffolding for the Inaugural platform. Castle indicated that she walked through the scaffolding. Castle also stated in the interview that she observed police who looked like "power rangers" dressed in black standing around the building, but they were not in front of the doors she and DiFrancesco entered. However, upon review of the Castle's cell phone, she took a picture of numerous police officers standing next to the Capitol building.

According to Castle, they walked inside the Capitol and went in further to try to get away from the large group, to get warm, and to find a bathroom. Although they went in to use the restroom, Castle ended up near a room labeled "House of Representatives" and she took a picture

of it. Castle claimed that she was scared, wanted to get out of the building, and wanted to forget about everything that happened that day. [4] However, it was only after she was tear gassed by police that Castle decided to leave. And, after she exited, she and her sister sat in the Northwest Courtyard Lawn on two foldable chairs. Castle told the FBI that they were waiting for her son. At approximately 3:49 p.m., her son arrived but instead of leaving together, they all approached the Senate Wing Door again and stayed there for an additional thirty minutes before leaving. Castle claimed that she was confused with the U.S. Capitol layout and was unsure of which door they exited. However, she acknowledged that she exited the same door she used to enter the Capitol. Castle said that she knew it was wrong to be in there and deleted all photos that she took that day. She claimed that she regretted her decision to go inside the Capitol and they cut their planned trip short a day and went back to Illinois immediately after.

Castle acknowledged that she knew at the time she entered the Capitol that she did not have permission to enter the building and she paraded, demonstrated, or picketed inside the building.

*The Charges and Plea Agreement*

On May 27, 2022, the United States charged Castle by criminal complaint with violating 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). On June 1, 2022, law enforcement officers arrested her in Chicago, IL. On July 28, 2022, the United States charged Castle by a single-count Information with violating 40 U.S.C. § 5104(e)(2)(G). On August 17, 2022, pursuant to a plea agreement, Castle pleaded guilty to Count One of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Department of the Treasury.

---

[4] Attached please find a video labeled "Exh – 3: Lobby," from timestamp 12:30 to 15:30, which depicts Castle and DiFrancesco walking in the hallway inside the Capitol (seen towards the bottom of the screen) and using their phones to take photos and video of the rioters.

### III.     Statutory Penalties

Castle now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a "grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Castle's

participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Castle, the absence of violent or destructive acts is not a mitigating factor. Had Castle engaged in such conduct, she would have faced additional criminal charges.

One of the most important factors in Castle's case is the fact that Castle stayed inside the Capitol building for almost 40 minutes, took photos and videos, and remained on restricted grounds, in the mob gathered right next to the building, for more than an hour after exiting the Capitol building. In total, defendants stayed on Capitol grounds for more than two hours, including inside of the Capitol and on the restricted grounds. Although Castle expressed remorse in her statement, she also stated that she knew she was not supposed to be inside the Capitol at the time she entered. Castle also entered the building merely minutes after the first breach of the Capitol, where rioters smashed windows adjacent to the Senate Wing Door that Castle entered through. Castle acknowledged that she saw police presence inside and around the Capitol but minimized her observation by claiming there were only a few of them. She denied observing violence when she was walking into the Capitol, but it is clear that mere minutes before she entered the Capitol, rioters broke the window adjacent to the Senate Wing Door where Castle entered. Castle heard the alarms ringing inside of the building. Instead of using that opportunity to exit, Castle continued to walk through the building and took photos and videos of the rioters inside the Capitol.[5] Castle and her sister DiFrancesco walked upstairs and downstairs between the first-floor lobby, the Crypt, the Visitor Center, and the Senate Wing Door. They both had multiple ways and opportunities to exit, but chose to stay inside the Capitol, despite knowing they were not supposed to be there.

---

[5] Attached please find a video labeled "Exh 4 – Castle Video," which is a video Castle took of other rioters, found on her phone by the FBI during the execution of the search warrant.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution in this matter.

### B.  The History and Characteristics of Castle

As set forth in the PSR, Castle does not have any criminal history and she has been compliant with the conditions of her pre-trial release. The PSR does not indicate that Castle has any health problems (PSR ¶ 37), or any drug or alcohol problems (PSR ¶¶ 40-41). Also, the PSR does not suggest that Castle was mentally and/or emotionally incapable of avoiding her criminal conduct (PSR ¶ 39); instead, she knowingly chose to engage in the criminal conduct discussed above.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Castle's actions on January 6, 2021, indicate the need for a sentence that provides specific deterrence as well. Castle entered the Capitol building, walked past police officers in riot gear and shattered glass; spent nearly 40 minutes inside traveling to various locations throughout the building; took photos and videos while inside the building; left only after being tear gassed; proceeded to stay outside on Capitol grounds for over an hour afterwards; and deleted photos and other information from her phone related to January 6. This behavior indicates not a momentary lapse in judgement, but an alarming systematic disregard of warning signs and the struggles that officers faced on that day. The fact that Castle stayed on the Capitol grounds for over an hour after exiting the building, adding to officers' difficulties in clearing the Capitol grounds, is particularly troublesome in light of Castle receiving assistance from an officer inside the Capitol building when she was tear gassed right before going outside. As indicated above, the PSR does not suggest that Castle was mentally and/or emotionally incapable of avoiding her criminal conduct (PSR ¶ 39); instead, she knowingly chose to engage in the criminal conduct discussed above. Castle's list of poor and reckless decisions that day was so lengthy that it is clear that a sentence involving incarceration is needed to successfully deter Castle from such thoughtless behavior in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[6] This

---

[6] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

Court must sentence Castle based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Castle has pleaded guilty to Count One of the Information, charging her with Parading, Demonstrating, or Picketing in any of the Capitol buildings in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. §1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity

among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

16

It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who witnessed violence and/or chaos before entering the Capitol building, who entered the Capitol through locations where there was obvious damage (including shattered glass), such as the Senate Wing Door; or who spent significant time inside the Capitol and took photos and videos while inside. A defendant who enters the Capitol shortly after it was breached and stays within the Capitol for a longer amount of time, is in a more serious category of offenders than defendants who were not in the first wave of rioters or defendants who walked in and immediately walked out of the Capitol. An unauthorized individual inside the Capitol for a longer period of time poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser walking out immediately.

In *United States v. Brian Stenz*, 21-cr-00456 (BAH), the defendant pled guilty to the same misdemeanor charge here, 40 U.S.C. § 5104(e)(2)(G). Similar to Defendant Castle here, Stenz chaos before entering the Capitol building (seeing blood in a fountain, rioters hanging from scaffolding, and people breaking windows), entered the Capitol building through the Senate Wing Door while passing shattered glass, and took photographs while inside. Stenz also briefly entered Senators Merkley's office, which Defendant Castle did not do here; however, Castle entered the Senate Wing Doors shortly after the initial breach (while Stenz did not enter until approximately an hour after that breach), and Castle spent almost 40 minutes inside the Capitol building (while Stenz spent only about eight minutes inside). Chief Judge Howell sentenced Stenz to 14 days' incarceration and two months' home detention as a condition of a 36 months' probation.

Like *Stenz*, Defendant Castle entered the Capitol through the Senate Wing Door only minutes after it was initially breached. Like *Stenz*, Castle knew that she was not supposed to enter the Capitol but still entered.

In *United States v. Savannah McDonald*, 1:21-CR-00429, the defendant also pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G). Similar to Defendant Castle here, McDonald spent time on the West Front of the Capitol grounds and observed violence before entering the Capitol building; experienced being tear gassed and remained on Capitol grounds (McDonald was tear gassed three times before entering the Capitol building); entered near the Senate Wing Door (through the Senate Fire Door which had been opened shortly before by two rioters who had entered through the Senate Wing Door); remained inside for approximately 40 minutes; took and sent videos on January 6th through her Snapchat account; and attempted to delete photos, videos, and/or other information related to January 6 (she sent a Snapchat message to a private group requesting that anyone who was sent materials regarding January 6th delete them). This Court imposed a sentence of 21 days' incarceration in that case.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    A Sentence Imposed For a Petty Offense May Include Both Incarceration and Probation.

### A.  Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[7] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[8]

---

[7] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part II *infra*.

[8] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

### B. Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617

F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless." *Little*, 2022 WL

768685, at *4. But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated

phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific

statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section

3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Castle and DiFrancesco pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*,

82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a

petty offender may face a sentence of up to five years in probation).

VI.    **A Sentence of Probation May Include Incarceration as a Condition of Probation, Though Logistical and Practical Reasons May Militate Against Such a Sentence During an Ongoing Pandemic.**

A.   **Relevant background**

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563.

Among the discretionary conditions of probation, a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other
> intervals of time, totaling no more than the lesser of one year or the term of
> imprisonment authorized for the offense, during the first year of the term of
> probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to

impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL

25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement"

such as "for a week or two." *Id.*[9]

B.   **Analysis**

A sentencing court may impose one or more intervals of imprisonment up to a year (or the

statutory maximum) as a condition of probation, so long as the imprisonment occurs during

"nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does

not define an "interval of time," limited case law suggests that it should amount to a "brief period"

---

[9] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not
intended to carry forward the split sentence provided in Section 3561, by which the judge imposes
a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404,
at *98.

of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[10]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

---

[10] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

28

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Castle to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:

Nialah S. Ferrer
New York Bar No. 5748462
Assistant United States Attorney
601 D Street, NW
Washington, D.C. 20530
(202) 557-1490
Nialah.Ferrer@usdoj.gov

## CERTIFICATE OF SERVICE

On this 15th day of November 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

*Nialah S. Ferrer*

_____

Nialah S. Ferrer
New York Bar No. 5748462
Assistant United States Attorney
601 D Street, NW
Washington, D.C. 20530
(202) 557-1490
Nialah.Ferrer@usdoj.gov